1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1-09-50026-reg

Adversary Case No. 09-00504-reg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

GENERAL MOTORS CORPORATION,

        Debtor.

- - - - - - - - - - - - - - - - - - - -x

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GENERAL MOTORS

CORPORATION,

                 Plaintiff,

        -against-

JPMORGAN CHASE BANK, N.A. individually and as Administrative

Agent for various lenders party to the Term Loan Agreement

described herein, ABN AMRO Bank N.V. et al.,

               Defendants.

- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York

            October 6, 2009, 9:55 AM

B E F O R E :

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1  HEARING re Chamber Conference (1) Fee Examiner; (2) Case

2  Management Order.

3

4  HEARING re Chamber Conference re:  Evercore.

5

6  HEARING re Application for an Order Pursuant to Section 327(a)

7  and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a)

8  Authorizing the Employment and Retention of Evercore Group

9  L.L.C. As Investment Banker and Financial Advisor for the

10  Debtors Nunc Pro Tunc to the Petition Date.

11

12  HEARING re Motion to Strike Ad Hoc Committee of Asbestos

13  Personal Injury Claimants' Objection to Motion to Extend Stay

14  to Certain Litigation filed by N. Kathleen Strickland on Behalf

15  Remy International, Inc.

16

17  HEARING re Motion to Extend Automatic Stay re: Remy

18  International, Inc.

19

20  HEARING re Debtors' Third Omnibus Motion Pursuant to 11 U.S.C.

21  Section 365 to Reject Certain Unexpired Leases for

22  Nonresidential Real Property.

23

24  HEARING re Debtors' Seventh Omnibus Motion Pursuant to 11

25  U.S.C. Section 365 to Reject Certain Executory Contracts.

3

1    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

2    U.S.C. Section 105(a) and Fed. R. Bankr. P. 3007 and 9019(b)

3    Authorizing the Debtors to (I) File Omnibus Claims Objections

4    and (II) Establish Procedures for Settling Certain Claims.

5

6    HEARING re Motion to Extend Automatic Stay on Behalf of Detroit

7    Diesel Corporation to Cover Certain Litigation.

8

9    HEARING re Motion to Dismiss Party Detroit Diesel Corporation

10   (related document(s) 3960) Filed by Gerolyn P. Roussel on

11   Behalf of Jeanette Garnett Pichon.

12

13   HEARING re Adversary Proceeding Official Committee of Unsecured

14   Creditors vs. JPMorgan Chase Bank N.A.  Pretrial Conference.

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Pnina Eilberg

25

4

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES LLP

4            Attorneys for Motors Liquidation Company

5            767 Fifth Avenue

6            New York, NY 10153

7

8      BY:   EVAN S. LEDERMAN, ESQ.

9            STEPHEN KAROTKIN, ESQ.

10

11

12     BUTZEL LONG ATTONREYS AND COUNSELORS

13           Attorneys for Creditors' Committee

14           380 Madison Avenue

15           22nd Floor

16           New York, NY 10017

17

18     BY:   ERIC B. FISHER, ESQ.

19           BARRY N. SEIDEL, ESQ.

20

21

22

23

24

25

5

1

2   KELLEY DRYE & WARREN LLP

3        Attorneys for JPMorgan Chase Bank

4        101 Park Avenue

5        New York, NY 10178

6

7   BY:   JOHN M. CALLAGY, ESQ.

8         NICHOLAS J. PANARELLA, ESQ.

9

10

11  LECLAIR RYAN

12       Attorneys for Detroit Diesel Corp.

13       830 Third Avenue

14       Fifth Floor

15       New York, NY 10022

16

17  BY:   MICHAEL T. CONWAY, ESQ.

18

19

20

21

22

23

24

25

6

1

2      ROPERS MAJESKI KOHN BENTLEY

3            Attorneys for Remy International

4            17 State Street

5            Suite 2400

6            New York, NY 10004

7

8      BY:   GEOFFREY W. HEINEMAN, ESQ.

9

10

11     STUTZMAN, BROMBERG, ESSERMAN & PLIFKA

12            Attorneys for Ad Hoc Committee

13            2323 Bryan Street

14            Suite 2200

15            Dallas, TX 75201

16

17     BY:   SANDER L. ESSERMAN, ESQ.

18

19

20

21

22

23

24

25

```
                                                                    7
 1    DEATON LAW FIRM

 2          Attorneys for Plaintiffs

 3          One Richmond Square

 4          Suite 163W

 5          Providence, RI 02906

 6

 7    BY:   JOHN E. DEATON, ESQ.

 8

 9

10    KRAMER LEVIN NAFTALIS & FRANKEL LLP

11          Attorneys for Official Committee of Unsecured Creditors

12          1177 Avenue of the Americas

13          New York, NY 10036

14

15    BY:   ADAM ROGOFF, ESQ.

16

17

18    UNITED STATES DEPARTMENT OF JUSTICE

19          Attorneys for Office of the United States Attorney

20          86 Chambers Street

21          New York, NY 10007

22

23    BY:   MATTHEW L. SCHWARTZ, AUSA

24

25
```

8

1

2    ROUSSEL & CLEMENT

3          Attorneys for Janette Garnett Pichot, et al.

4          1714 Cannes Drive

5          La Place, LA 70068

6

7    BY:   PERRY J. ROUSSEL, JR., ESQ.

8          (TELEPHONICALLY)

9

10

11   ALSO PRESENT TELEPHONICALLY:

12         RICK GASHLER, Interested Party; Sandell Asset Management

13         JENNIFER H. SCHILLING, Interested Party;

14            Capital Management

15

16

17

18

19

20

21

22

23

24

25

9

PROCEEDINGS

1

2      THE COURT:  All right.  GM, I'll start with the

3  matters that GM has where it's the movant.  Then I will take

4  the status conference on the creditors' committee's adversary

5  against JPMorgan Chase and then I'll take the two motions by

6  the nondebtors vis-a-vis the extension of the stay.  Go ahead,

7  please.

8      MR. LEDERMAN:  Good morning, Your Honor.  Evan

9  Lederman, Weil, Gotshal & Manges for the debtors.

10      THE COURT:  Good morning, Mr. Lederman.

11      MR. LEDERMAN:  Good morning, Your Honor.

12      We have three uncontested matters that are on for

13  today.  I'm happy to walk the Court through them or if you'd

14  like --

15      THE COURT:  I'll tell you the truth, Mr. Lederman,

16  since there were no objections under my case management order,

17  I hate to make your trip down here so meaningless but I'm of a

18  view to just approve them all.

19      MR. LEDERMAN:  That's certainly fine with us, Your

20  Honor.

21      THE COURT:  Okay.  They're approved.

22      MR. LEDERMAN:  Thank you, Your Honor.

23      THE COURT:  Okay.  We're now up to the adversary

24  proceeding against JPMorgan Chase?

25      (Pause)

10

1       THE COURT:  All right.  Let me just get to know you

2   guys.  Tell me about your game plan for litigating this thing.

3       MR. FISHER:  Good morning, Your Honor.  Eric Fisher

4   from Butzel Long, special counsel to the creditors' committee.

5       As Your Honor is aware, this is an avoidance action

6   against JPMorgan and hundreds of other financial institution

7   defendants seeking to avoid significant amounts, in excess of

8   1.5 billion dollars, that was paid out postpetition.

9       Our game plan, Your Honor, for litigation the case is

10  we've conferred extensively with counsel for JPMorgan and we

11  have a plan to litigate this case quickly and without the

12  involvement of the hundreds of other defendants aside from

13  JPMorgan.  JPMorgan served as administrative agent on the loan

14  that's really at issue here, the term loan.  And the other

15  defendants are defendants to the extent that they received

16  payments under the loan.  But neither side believes that those

17  hundreds of other defendants have meaningful discovery.

18      And so what we would propose to Your Honor today, and

19  we're prepared to hand up an agreed to scheduling order, is

20  that the creditors' committee's time to serve the summons and

21  complaint be extended out in total to 240 days.  And that

22  JPMorgan and the creditors' committee have proposed -- will

23  propose a schedule that allows us to essentially litigate this

24  case from beginning through dispositive motions during that

25  period of time and have dispositive motions briefed to Your

11

1   Honor by March 2010.

2          THE COURT:  Uh-huh.  I may want to hear more from you,

3   Mr. Fisher.  But I'd like to hear from counsel for JPMorgan

4   chase.

5          MR. CALLAGY:  Good morning, Your Honor.  John Callagy

6   from Kelley Drye & Warren representing JPMorgan Chase both

7   individually and as administrative agent, we were sued in both

8   capacities.

9          THE COURT:  Your client has some of its own money

10  still in the facility?

11         MR. CALLAGY:  Correct.  Well actually the money has

12  been paid, as Your Honor knows.  The money has been paid out of

13  the -- from the --

14         THE COURT:  Okay.  But it had a piece of the action --

15         MR. CALLAGY:  Yes.

16         THE COURT: -- in the underlying indebtedness.

17         MR. CALLAGY:  Yes.

18         THE COURT:  It wasn't all, hundred percent, syndicated

19  out.

20         MR. CALLGY:  Correct.  So as Mr. Fisher stated, we've

21  been trying to wrestle with the idea of how do we get this

22  thing resolved without bringing in 300 other investors, members

23  of the syndicate.  And it seems, even though JPMorgan is of the

24  position -- and we have provided evidence to the creditor's

25  counsel that there was no authority for the inadvertent filing

12

1    of the original UCC 3 which was actually filed on the wrong

2    loan at the time it was filed on the wrong loan at the time it

3    was originally filed.

4         Not being satisfied with that, we have offered to make

5    certain discovery available to them to try to satisfy the

6    creditors' committee that in fact there was no authority for

7    the filing of the UCC 3 on what we refer to as the term loan as

8    opposed to the other loan with a synthetic lease transaction

9    which was properly terminated back in 2006.  When the UCC 3 was

10   filed terminating that loan and the UCC 3 was filed terminating

11   the so-called term loan or the collateral on the term loan, the

12   perfected nature of the term loan.

13        THE COURT:  Uh-huh.  All right.  Here's what I want

14   you to do, folks.  I want you to prepare a stip or consent

15   order that lays out what you're going to do.  If it's along the

16   lines of what you described to me I'm not going to give you a

17   problem with approving it.  I wanted to deal with the

18   participation of the non-Chase parties.  What you folks are

19   going to do, how you're going to structure the discovery and

20   your recommendations for teeing up motions.

21        I do want to do a stop, look and listen as to whether

22   I think summary judgment's going to, which is what I assume you

23   mean by dispositive motions, is going to be productive or not.

24   I'm not saying that I would forbid people from doing summary

25   judgment motions but history has taught me that sometimes a

13

1    reality check is constructive.

2           Is there anybody, other than the two of you, who wants

3    to be heard on this adversary proceeding before I go further?

4       (No audible response)

5           THE COURT:  I don't see anybody.  Okay.  Any problem

6    with doing that, Mr. Callagy?

7           MR. CALLAGY:  Your Honor, we actually have prepared,

8    jointly, a stipulated scheduling order.  And I believe that

9    it's on a disk pursuant to Your Honor's preference and it is --

10   we can make that available on short order.

11          THE COURT:  All right.  Mr. Fisher, you've reviewed it

12   and you're on board on that as well?

13          MR. CALLAGY:  Yes, we agree with it and we're prepared

14   to hand it up right now.

15          THE COURT:  Well handing it up right now isn't going

16   to accomplish much.  But if you take it across the hall to my

17   courtroom deputy and tell her to put it in the pile for stuff

18   for me to see when I can get to it, I'll review it.  And if

19   it's the way you described it, I'll approve it.

20          MR. CALLAGY:  Can I have a little more guidance, Your

21   Honor, in terms of stop, look and listen in terms of how and

22   what form would you like us to provide that advice to the

23   Court?

24          THE COURT:  Well I've got to tell you the truth, Mr.

25   Callagy.  I triage my matters and I deal with the most urgent

14

1    ones and that's both in terms of preparing for hearings and

2    deciding disputes.  I'm not up to speed on the underlying

3    issues in this adversary to the same extent I would be if you

4    actually had a motion before me rather than a status

5    conference.  And unless I'm missing something, this is the

6    first status conference we've had in this adversary proceeding.

7            MR. CALLAGY:  Yes.

8            THE COURT:  What I normally do, and I see no reason

9    why this would be an exception, is I find out what somebody

10   wants to raise in the way of a dispositive motion and the

11   theory under which he or she or it thinks it should be granted.

12   And I don't look for a mini-briefing or mini-trial but I just

13   try to get the lay of the land and understanding of what is the

14   subject of the motion.  Then I have, typically, a conference

15   call, if people are in town sometimes in person.  I tell you my

16   views as to whether I would prefer to take a summary judgment

17   motion or whether I just prefer that you give me your direct

18   testimony affidavits and we try it.

19           MR. CALLAGY:  Okay.  Thank you.  We will do that at

20   the appropriate time, Your Honor.  Thank you.

21           THE COURT:  Okay.  Have a good day, folks.

22           MR. FISHER:  Thank you, Your Honor.

23           THE COURT:  All right.  Now, do I have anything on the

24   calendar other than the Detroit Diesel and Remy motions to

25   extend the stay?

15

1    (No audible response)

2        THE COURT:  All right.  Are the movants here on that?

3        UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

4        THE COURT:  Come on up, please.  I'll hear first from

5    Detroit Diesel.  Actually, no I want the movants on both to

6    come up and I also want you to come up, Mr. Esserman.

7        MR. CONWAY:  Good morning, Your Honor.  Michael Conway

8    of LeClair Ryan representing Detroit Diesel Corporation.

9        THE COURT:  All right, Mr. Conway.

10       MR. CONWAY:  Your Honor --

11       THE COURT:  No, I'll take introductions and then I

12   have preliminary remarks.  I don't want to hear argument yet.

13       MR. HEINEMAN:  Good morning, Your Honor.  Geoffrey

14   Heineman from Ropers Majeski Kohn and Bentley for Remy

15   International.

16       THE COURT:  All right.

17       MR. ESSERMAN:  Good morning, Your Honor.  Sander L.

18   Esserman for the ad hoc committee.

19       THE COURT:  All right.  Gentlemen, the motion to

20   strike the -- yes?

21       MR. DEATON:  Good morning, Your Honor.  John Deaton, I

22   was admitted pro hac vice for four Rhode Island cases that are

23   affected by this.

24       THE COURT:  Your last name again?

25       MR. DEATON:  D-E-A-T-O-N, John Deaton.

16

1          THE COURT:  All right.  Gentlemen, the motion to

2     strike the asbestos committee's response on the ground that it

3     was filed thirty-six minutes late is denied.  And I don't know

4     how people practice where you came from, but I'm not going to

5     speak at length on what I think of that motion, we're going to

6     deal with the merits.

7          Now, when it's time for Detroit Diesel and Remy to

8     speak I want you to brief me on the extent, if any, to which a

9     362 extension motion has ever been granted when the debtor

10    didn't ask for it and when the third party, which was seeking

11    to extend it, was professing to speak what was good for the

12    estate and the debtor and the creditors' committee didn't share

13    its view and didn't join in that kind of a motion.

14         I also want you to address the prejudice, to me, of an

15    incremental unsecured claim effecting the debtor's ability to

16    reorganize or creating material distraction to a management

17    operating its company and the extent to which impairing the

18    ability of tort litigants to go against a nondebtor is

19    consistent with the public interest.  I'll start with you, Mr.

20    Conway.

21         MR. CONWAY:  Thank you, Your Honor.  I'll start with

22    your first inquiry with respect to a matter that's been raised

23    of this nature by a nondebtor where the creditors' committee

24    and the debtor did not join.  Frankly, I'm not aware of any

25    case like that.  I'm also not aware of any case which was

17

1   denied -- any motion was denied for those reasons.  And I will

2   go so far as to say, Your Honor, that this motion was vetted

3   with the debtor before it was made and there is no concerns

4   raised to me from the debtor.  I have no reason to believe that

5   the debtor has an issue with this and I suspect the debtor has

6   to realize that it's in the best interest -- in their best

7   interest not to have the distraction during this case of having

8   Detroit Diesel make claims for defense fees every time they're

9   incurred.  We're talking about --

10          THE COURT:  Well, it's a prepetition -- the

11   indemnification obligation, assuming it exists, is a

12   prepetition debt, right?

13          MR. CONWAY:  Your Honor, the prepetition obligation

14   does exist.  We have cases that relate to GM and because of GM

15   Detroit Diesel that get filed on a regular basis.  Last year

16   there were 150, this year there are sixty-five.  I suspect next

17   year there'll be new cases we haven't heard of.  And I believe

18   the law is that a claim for indemnification that arises

19   prepetition based on a third party tort allegation gives rise

20   to a postpetition claim.

21          THE COURT:  In anywhere other than the Third Circuit?

22          MR. CONWAY:  Well, Your Honor, no.  Most of these

23   asbestos claims seem to end up in the Third Circuit.  No, I

24   can't give you --

25          THE COURT:  Because the Third Circuit law in that area

18

1    is an aberration, right?

2         MR. CONWAY:  I don't like to think of it that way,

3    Your Honor, since I'm arguing the same position.

4         THE COURT:  Go on.

5         MR. CONWAY:  Your Honor, the -- I think the crux of

6    your various questions was what is the harm to or what is the

7    impact on the GM bankruptcy.  Obviously the GM bankruptcy is

8    not indicative of every bankruptcy we've ever seen; it's a

9    little bit larger.

10        It's difficult for any of us who are not in the day-

11   to-day trenches administering this bankruptcy to know how

12   different it is from others.  But if we focus on this not

13   strictly as one of the largest bankruptcies in the history of

14   this country but rather as if it were any other bankruptcy,

15   there's no doubt that having hundreds of claims for

16   indemnification filed on a regular basis and having to do a

17   valuation hearing as to what the possible indemnification

18   claims would be going forward for those cases that haven't been

19   filed yet would be a tremendous burden to the estate.  Whether

20   that's material, in light of the billions of dollars at stake,

21   in the GM bankruptcy is another question.  But Detroit Diesel

22   Corporation, which was not in existence when any of these

23   claims were -- came to light, should not be held responsible

24   for the fact that it happened to be related to a debtor that's

25   larger than others.

19

1    The fact of the matter is, Your Honor, none of these

2    cases relate to claims made after Detroit Diesel came into

3    existence.  They all relate to claims from the '60s, the 70s,

4    before Detroit Diesel was ever even considered by GM.  I think

5    GM created Detroit Diesel in 1988 in a joint venture with the

6    Penske Corporation.  And these -- this concept that these

7    plaintiffs are using to threaten liability here isn't that

8    there's a -- that Detroit Diesel's a joint tortfeaser.  It's

9    that Detroit Diesel somehow has successor liability of GM.

10    GM didn't go out of business in 1988 and none of these

11    assets are related to a wholesale sale of assets of a business.

12    They were specific assets sold to a newly formed corporation.

13    Any claims that could have been made based on problems with

14    asbestos that GM had in the '60s and the '70s relate to GM.

15    That's why GM entered into an agreement that said any costs you

16    incur we'll pick up.  Any liability you incur from a judgment

17    we'll pick up.

18    They had an insurance policy specifically related to

19    these claims, which will be attacked by Detroit Diesel

20    Corporation if there's an unpaid judgment for indemnification

21    or an unpaid claim for indemnification.  And what we've got

22    here is an opportunity for these plaintiffs who would

23    otherwise, if these were just strictly claims against GM and

24    they would be standing in the shoes of every other unsecured

25    creditor of GM, it's an opportunity for them to say okay we'll

20

1    get a hundred cents on the dollar from Detroit Diesel.  Detroit

2    Diesel will then be responsible for going to GM and getting

3    their share of the unsecured creditor's claim.  And then going

4    to the insurance carriers who, under both Michigan and New York

5    law, would have to pay a hundred cents on the dollar from those

6    policies that exist to protect GM and are property of the GM

7    estate.

8           So now what they've done is they've -- one shifted the

9    burden to Detroit Diesel to get paid in full but they've also

10   stepped in front of all those creditors of GM that aren't going

11   to get paid in full.  It's simply an end to run around the

12   Bankruptcy Code.  It's not a situation here where we have joint

13   tortfeasers the way you have in most cases where there's a

14   request to extend the stay.

15          You've got debtors that request an extension of the

16   stay to protect their officers and directors.  When the

17   officers and directors are clearly joint tortfeasers those

18   motions are granted typically because of the necessity at the

19   outset of a bankruptcy case.  They're usually not stays that

20   last throughout the case but the fact of the matter is that's

21   not what A.H. Robbins was contemplating, it's what its become.

22   H. Robbins contemplated what we have here, where you've got an

23   entity which is being sued not because it's a joint tortfeaser

24   but because it was once somehow a part of the debtor who was

25   the tortfeaser.

21

1        There's no case that's been cited in any of the briefs

2    that comes close to being an A.H. Robbins case as ours.  Our

3    case, unfortunately, is raised in a bankruptcy where it's hard

4    to argue that the millions of dollars at stake, if not hundreds

5    of millions of dollars at stake, are material.  Because the GM

6    case has billions of dollars at stake.

7        But again, as I pointed out Your Honor, I don't think

8    that Detroit Diesel should be penalized because GM's a big

9    case.  I think the same principles should apply whether this

10   was a hundred million dollar bankruptcy or a hundred billion

11   dollar bankruptcy.

12       Now there's been some attack on this theory that

13   Detroit Diesel will be entitled to make a claim against the

14   insurance policies.  Well as I point out, Your Honor, there's

15   no question under the bankruptcy law that these policies are

16   property of the estate.  But there's also no question --

17       THE COURT:  Don't bankruptcy courts traditionally make

18   a distinction between entitlement to the policies being

19   property of the estate and their proceeds being property of the

20   estate?  And aren't we really talking about access to the

21   proceeds in contrast to the policy itself?

22       MR. CONWAY:  Well at the end of the day, Your Honor,

23   nobody cares about the policies; they only care about the

24   proceeds.  But I think that's true in every case.  I think

25   that --

22

1      THE COURT:  Yeah.  But when does the debtor get the

2  proceeds of a liability policy?

3      MR. CONWAY:  The debtor --

4      THE COURT:  The debtor doesn't turn the proceeds of a

5  liability policy and turn it into a distributable sum for the

6  benefit of its creditors.  It uses it to satisfy obligations

7  that it owes to the plaintiffs of America.

8      MR. CONWAY:  Well Your Honor, I think that in this

9  case you're going to find that a number of the creditors out

10  there are going to be creditors with claims that fall under

11  these policies.  If those creditors receive a recovery, whether

12  it be ten cents on the dollar or one cent on the dollar, that's

13  a claim that the GM estate has against that insurance policy

14  for reimbursement so that they can then increase the pool for

15  the creditors.

16      There's no reason why the pool that GM has established

17  for its unsecured creditors should be diminished if there's an

18  insurance policy in effect.  The insurance policy proceeds

19  aren't, somehow, cut away from the bankruptcy estate here.

20  They are going to be available -- if there are claims made

21  they're going to be made available to GM if there are claims

22  made against GM that qualify under the policy.

23      Now I agree with you that Detroit Diesel is interested

24  in the proceeds of the policy but so is GM.  And the fact of

25  the matter is, Your Honor, if the debtor was concerned about

23

1    having some negative impact of extending the stay, I imagine

2    they probably would have put in papers objecting to the

3    extension of the stay.  The fact that they didn't, I think --

4          THE COURT:  Well, could there be a middle course, that

5    the debtor doesn't care?  That it doesn't regard -- the effect

6    on the estate is material enough to waste the 5,000 dollars

7    applying something that might cost it?

8          MR. CONWAY:  Your Honor, that's exactly why we're here

9    making the motion and the debtor isn't.  Because from the

10   debtor's point of view this case is very complicated.  There's

11   an administration that involves issues that prevent it from

12   really focusing on the problems of Detroit Diesel Corporation,

13   of Remy.  They don't have the time to do this, but we do.

14   Maybe if they had another couple of years to focus on this

15   they'd get around to it.  But the fact is, they don't have the

16   time we do, that's why we're making the motion.  And frankly,

17   Your Honor, if the debtor didn't care then -- well Your Honor,

18   that's entire possible, they don't care.  But it seems unlikely

19   that they wouldn't take some position either for or against the

20   motion.  What they don't care about is incurring the expense of

21   either supporting or objecting to the motion given the fact

22   that there's no harm to the estate.  And in fact it's pretty

23   clear from the papers there's a benefit to the estate, however

24   material.  There's a benefit to the estate so why should they

25   put in those few dollars, if you want to call it, 5,000 dollars

24

1    or whatever.  It's something that they're leaving to Detroit

2    Diesel's counsel and Detroit Diesel's pocketbook.  And there's

3    nothing wrong with that.  There's nothing about that that

4    should imply that it's not acceptable under the code to do it

5    this way.  There's nothing -- there's no case that says this is

6    how you do it, if the debtor doesn't bring the motion, relief

7    denied.  There's no statute that says if the debtor doesn't do

8    it, relief denied.

9           What we have here is a situation where, again, we've

10   got a case that's larger than most where the debtor's counsel

11   probably just don't have the time to give it as much

12   consideration as counsel for Detroit Diesel.

13          I'd like to think I answered your questions, Your

14   Honor, but if I didn't --

15          THE COURT:  Okay.  Anything else?

16          MR. CONWAY:  No, Your Honor.  I believe the papers

17   answer every other question that might be asked.

18          THE COURT:  Very well.  Mr. Heineman?

19          MR. HEINEMAN:  Good morning, Your Honor.  Geoffrey

20   Heineman from Ropers Majeski Kohn & Bentley for Remy

21   International.

22          I don't really have much more to add that my cocounsel

23   hasn't already made.  I just want to address, just one or two

24   points, one of which is just to make sure there's an

25   understanding Remy was -- Remy, in 1994, purchased the assets

25

1    of the Delco Remy division.  All of the litigations, the five

2    litigations that we're involved in all relate to alleged

3    exposure to asbestos prior to 1994.  So that all arises out of

4    GM products and GM premises and that's why we believe the

5    expansion of the stay is appropriate.  I would note that we did

6    notice the plaintiffs in all five of those actions, none of

7    those plaintiffs have opposed the motion. In addition, none of

8    the members of the ad hoc committee are plaintiffs in any of

9    the cases that Remy is a defendant in.

10        With respect to the insurance issue, Your Honor, you

11   make very valid points with respect to that.  Remy, as a

12   division -- the Remy division of General Motors pre-1994 would

13   in fact be insured under General Motor's policies.  These are

14   all occurrence based policies, the policies that are

15   potentially at play in these five litigations are all current

16   space policies that were in effect when the alleged exposure

17   happened, which could be five years, ten years, fifteen years

18   before 1994.

19        To the extent Remy was a division during that time

20   period, Remy would have been insured and therefore Remy would

21   be entitled to make claim under those policies.  Which

22   obviously would impact the estate.

23        I think the rest of the points have all been made,

24   Your Honor, and I don't want to waste the Court's time

25   reiterating the points that my cocounsel has made.

26

1      THE COURT:  Very well.  Thank you.  Mr. Esserman?

2      (Pause)

3      MR. ESSERMAN:  Your Honor, Sandy Esserman for the ad

4  hoc committee.  I just have a couple points I'd like to raise.

5  I think we've addressed most everything in our papers.  We do

6  think the form of these motions are inappropriate and they

7  should be brought by adversary proceeding.

8      I would note that the Remy motion was filed September

9  16th and there was an objection by one of the claimants that

10  are the subject of the Remy motion filed, they joined in our

11  papers.

12      Further, there's been some discussion of insurance.

13  We've asked for the insurance policies.  The only thing we've

14  heard colloquial in this court is that there's a twenty-five

15  million dollar deductible on these insurance.  So I don't know,

16  in fact, that there is any insurance that's realistically

17  available to any claimant.  I think that came out during the

18  sale motion.  So I don't know that joint insurance is somehow

19  an issue and I don't know that these entities are even covered

20  by it.

21      Other than that, we've made all the points in our

22  papers.  Thank you.

23      THE COURT:  Okay.  Anybody else want to weigh in?

24  Yes, sir.  Come on up, please.

25      MR. DEATON:  Thank you, Your Honor.  Your Honor, John

27

1   Deaton, D-E-A-T-O-N, for four individual plaintiffs in the

2   state of Rhode Island.

3       I'm not going to belabor points but I want to make a

4   few observations.  The first observation I would make, and I

5   want to thank the Court for letting my clients be heard and my

6   pro hac vice motion.  Counsel for Detroit Diesel not only in

7   their brief but in their oral argument makes averments and they

8   want the court to accept those averments as evidence.  There is

9   no evidence, whatsoever, in their brief.

10      For example, in their oral argument they say none of

11  these claims deal -- they deal with the '50s and the '60s and

12  the '70s.  Well I might know my cases because I'm a tort

13  attorney, I'm not a bankruptcy attorney, a little bit better

14  than Detroit Diesel's counsel but that's a factual issue.

15      The Kroskob case is a forty-four year old living

16  mesothelioma case.

17      THE COURT:  Forgive me, Mr. Deaton, and I know you

18  don't appear in bankruptcy court as often as some of the other

19  folks in the room.

20      MR. DEATON:  Yes, sir.

21      THE COURT:  But I need to focus on the matters of

22  bankruptcy law and I don't think it's either necessary or

23  appropriate for me to delve into the merits of the individual

24  lawsuit or lawsuits that you might be prosecuting.  It seems to

25  me that that's an issue for the foreign court to decide if I

28

1   allow that lawsuit to continue.

2        MR. DEATON:  Yes, Your Honor.  The only point that I

3   was making was that counsel in their oral argument said all of

4   these cases predate the '94 or not even to the '90s and that's

5   not true.  The Kroskob case does go into the '90s.  So I just

6   wanted to make that factual distinction since they addressed

7   it.

8        I'm not going to go into the merits or the procedure

9   other than to say that Your Honor just raised an important

10  issue which is the foreign state.  Detroit Diesel removed the

11  claims to Rhode Island Federal District Court, got an extension

12  and then we're here today.  If this Court does not make some

13  type of findings of fact or conclusions of law related to the

14  bankruptcy matter, then I would be fighting this fight in Rhode

15  Island Federal District Court where the intent will be to put

16  it in the NDL.  And so this is the right court to hear the

17  merits, not of the individual cases but of Detroit Diesel's

18  claim, Your Honor.  And the only thing I would --

19       THE COURT:  Why should I be doing anything more than

20  dealing with the bankruptcy issues?  Why should I be telling an

21  Article III district judge how to manage his docket if he's got

22  the case before him?  Or if, for that matter, he wants to

23  remand it that would, at least, seemingly be his business.  If

24  he wants to keep it and try it himself, that would at least

25  seemingly be his business.  Or if he wants to MDL it for

29

1    pretrial purposes before he hears it, I mean that's the way 28

2    U.S.C. 1407 works, isn't it?

3         MR. DEATON:  Understood, Your Honor.  But Detroit

4    Diesel gave me notice and placed my plaintiffs and their claims

5    in peril before this Court.  And with all due respect to my

6    fine judges in Rhode Island, they don't have the bankruptcy

7    expertise that this Court has.

8         And the only comment I want to make, Your Honor, is

9    that when you read the brief by Detroit Diesel it is a pyramid

10   of possibilities and inferences.  And the only comment I'll

11   make is that they say they may have a claim for

12   indemnification, they may be able to recover the debtor's

13   insurance.  Should they receive a judgment then maybe a

14   judgment in an asbestos case could be used as offensive

15   collateral estopple against the debtor.  It's possible that a

16   subsequent suit for indemnification may follow.

17        And finally, Detroit Diesel might be successful in

18   indemnification action.  That's six hypothetical possibilities,

19   Your Honor.  And zero plus zero six times equals zero.

20        Thank you.

21        MR. HEINEMAN:  Your Honor, if I could just add one

22   point?

23        THE COURT:  Yeah.  I'll give you a chance to reply but

24   I want to deal with things in an order.  Is there anybody who

25   hasn't been heard a first time before I give Mr. Heineman a

30

1  chance to be heard a second, that is who hasn't been heard a

2  first time who wants to be heard a first time?

3  　　　　　MR. ROUSSEL:  Yes, Your Honor.

4  　　　　　THE COURT:  Wait, was somebody speaking up?

5  　　　　　MR. ROUSSEL:  Yes.

6  　　　　　THE COURT:  Is there somebody on the phone?

7  　　　　　MR. ROUSSEL:  Yes.

8  　　　　　THE COURT:  Well speak up, sir.  Tell me who you are,

9  first.

10 　　　　　MR. ROUSSEL:  This is Perry Roussel.  I'm the attorney

11 for Jeanette Pichon that filed an objection in this case.  Can

12 you hear me, Judge?

13 　　　　　THE COURT:  Not very well, Mr. Roussel, so try to

14 speak up.

15 　　　　　MR. ROUSSEL:  I just wanted to point out, besides what

16 my -- the other attorneys have stated objecting to this motion,

17 is that the A.H. Robbins case filed by the debtor is completely

18 different than what Detroit Diesel is attempting to do in this

19 case.

20 　　　　　I mean, in A.H. Robbins basically the -- a property of

21 the estate was brought in and it was a debtor's estate.  And

22 also the employees of the company was covered by the state and

23 we all know that employees of a company aren't the ones that

24 cause the liability, a corporation can only act through its

25 employees.

VERITEXT REPORTING COMPANY

212-267-6868　　　　　　　　　　　　　　516-608-2400

31

1    What A.H., I mean what Detroit Diesel is requesting

2    here is more analogous to having Allstate Insurance Company

3    filing bankruptcy and all of the persons that caused an

4    automobile accident around the country applying for coverage in

5    the bankruptcy stay.  Which -- and all of those individuals

6    would be independently liable for their actions and could not

7    fall under the bankruptcy estate.

8    There's no basis for what Detroit Diesel is attempting

9    to do here in bankruptcy court.  And again, we would ask that

10   that motion be denied.

11   I have nothing further to add except that my brief has

12   been filed.

13   THE COURT:  All right.  Mr. Conway, anything further?

14   MR. CONWAY:  Only a quick response to the extent

15   necessary, Your Honor.  Again, counsel for Mr. Pichon likens

16   our case to one where there are joint tortfeasers.  Nobody's

17   alleged Detroit Diesel Corporation is a joint tortfeaser but

18   rather successor in interest to a joint tortfeaser -- to a

19   tortfeaser.

20   Similarly, Your Honor, the allegation that there's no

21   evidence here is refuted by our papers which are full of

22   evidence.  We've got witness statements and the documents

23   involved.  And Mr. Pichon, who's on the phone, has filed in his

24   compliant which identifies the fact that his client was

25   involved in exposure to asbestos during 1955 to 1975, not after

32

1    1988.

2            Thank you, Your Honor.

3            THE COURT:  All right.  Mr. Heineman, anything

4    further?

5            MR. HEINMAN:  Just one or two points, Your Honor.  In

6    contrast to the issues that I've just heard with regard to

7    Detroit Diesel, there is no dispute that Remy is entitled to

8    absolute indemnity here.  There have been nineteen cases

9    commenced since 1994.  The debtor has indemnified Remy in each

10   and every one of those cases where defense costs as well as any

11   losses and settlements.

12           Also, with respect to this motion we're only seeking a

13   stay with respect to Remy.  General Motors is a defendant in

14   those five cases.  The claims have been stayed as to General

15   Motors.  We're seeking a stay only as to Remy not to any other

16   defendants.  We're not seeking to have the case transferred to

17   this court; we're not seeking to have the case stayed in its

18   entirety.

19           Thank you, Your Honor.

20           THE COURT:  All right.  Very well.  Everybody sit in

21   place for a minute.

22        (Pause)

23           THE COURT:  All right.  Ladies and gentlemen, I am

24   denying each of the motions and the following are my findings

25   of fact and conclusions of law in connection with this

1    determination.

2          First, as facts, I find that each of the two movants

3    is not a debtor in this case.  Nor has it been suggested or is

4    it the case that either has been deputized by the debtor with

5    the approval of the Court to act on behalf of the estate.

6          I further find that each of the two movants is a

7    defendant in one or more litigations against it, asserting

8    liability on behalf of the movant to one or more folks who are

9    suing or who might later sue asserting liabilities for injuries

10   associated with exposure to asbestos.  Though not strictly

11   relevant to this determination, I emphasize that I am

12   expressing no views and am making no findings of fact with

13   respect to the liability, if any, by any one of the movants to

14   any asbestos litigant.

15         In the case of one of the two movants, it has been

16   alleged that the debtors have an indemnification obligation to

17   the movant, in the other case that it may have.  Ultimately,

18   the extent to which the may turns into a does is irrelevant to

19   my determination because even assuming for the sake of argument

20   that the debtors do have such obligations to indemnify, their

21   unsecured claims, at least in this district and circuit.  In

22   fact, so far as I'm aware, in every district and circuit other

23   than the Third.  And because they're prepetition claims, we're

24   not talking about administrative expense exposure in either

25   event.  So if and to the extent any indemnification obligations

34

1    exist, they're garden variety prepetition claims.

2          There is also been some, but not much, showing that

3    the debtors have insurance, although the amount of the

4    deductible is not established.  Once more, I don't need to make

5    findings of fact on that because the briefing confused

6    insurance policies being property of the estate with the

7    proceeds.  Insurance policies are always, or almost always,

8    property of the estate.  But whether their proceeds are

9    property of the estate depends upon the extent to which there

10   is any realistic expectation that the debtor would have access

11   to the proceeds by which it could get that money in the till

12   and use it for debtor needs and concerns.

13          There has been no material showing that in these --

14   that these policies would give rise to a pot of cash that

15   creditors could turn into additional recoveries for themselves,

16   I'm sure creditors wish it were otherwise but that's simply not

17   the case.

18          I further find as facts that the defense of these

19   asbestos actions would have no material affect on the debtor's

20   reorganization or, for that matter, their liquidation.  They

21   would not -- there's been no showing that they would give rise

22   to material distraction of management or impair management

23   doing its job.  And while I assume, without deciding, that if

24   the indemnifications were allowed they would result in some

25   incremental dilution of other unsecured creditors' recoveries

35

1   since it's at least foreseeable that we're going to have a pot

2   plan here.  For the benefit of the unsecured creditor community

3   the incremental affect is not likely to have a material affect

4   on either the estate as a whole or on any of the other

5   creditors' recoveries.

6          Now as conclusions of law and bases for the exercise

7   of my discretion I state the following.  First of all, as a

8   conclusion of law, while a motion to extend the 362 stay is, in

9   the view of most, a contested matter and an effort to grant a

10  supplemental injunction under 105(a) to protect against the

11  assertion of third party claims does, as Mr. Esserman argued,

12  require an adversary proceeding.  I say this mainly, however,

13  for the benefit of the bar going forward because there are so

14  many reasons why the relief isn't appropriate here anyway that

15  this observation is not, by itself, dispositive in this case.

16         In this instance I have to deal with two other major

17  deficiencies, the second deficiency breaking down to three or

18  four separate deficiencies.  The first is that as we

19  established in oral argument there is no reported case in which

20  an injunction of the type sought here has ever been granted

21  when sought by somebody other than the debtor, a trustee or at

22  least the estate.  I guess there's no case to the contrary

23  either; a request of this character is unprecedented.

24         The normal circumstance under which either we extend

25  the scope of the 362 stay or grant a 105(a) injunction is to

36

1    protect the estate.  And when the estate needs protecting, it

2    asks for it.  And I don't know how many times cases on my watch

3    have presented exactly this issue but it's because the debtors

4    have asked for it.  And here, at the risk of stating the

5    obvious, we don't have that type of situation.

6         I don't need to say that such a request never could be

7    granted.  Perhaps it can be theorized that if a debtor sat on

8    its hands, and didn't do its job and an injunction of this

9    character were necessary to protect the creditors of the

10   estate, just like we sometimes grant STN authority such a

11   request might be considered, but this isn't such a case.

12        I'm confident that with counsel of the quality that we

13   have here representing the debtors and the creditors'

14   committee, if either of them thought relief of this type was

15   necessary to protect the interest of the estate we would have

16   heard about that.

17        Getting beyond that, we traditionally look at

18   particular factors to grant relief of this character.  To be

19   sure, as some of the papers note, irreparable injury is not

20   required to grant relief of this character but some injury is.

21   There's got to be some reason for granting the relief.  It may

22   be it needn't be irreparable but you've got to show something.

23   And here, as I found as a fact, there is no material affect

24   upon the estate or upon its ability to reorganize or upon its

25   ability to liquidate.

37

1       The factor of likelihood of success in reorganizing is

2  kind of a head scratcher here because this isn't going to have

3  an effect upon reorganization either way.  So while I think it

4  is true that the debtors are going to reorganize, or to put it

5  differently, I think it's true that the debtors are going to be

6  successful in taking the pot of cash they have and giving it to

7  their creditors and then confirming a plan to make that happen,

8  this motion has no effect on that one way or the other.

9       Another factor is balancing of the harms.  Now here we

10  have another head scratcher because the usual way by which

11  we've historically looked at the balance of the harms is to

12  look to the harm to the debtor, which is the one that's

13  normally asking for relief of this character, and the harm to

14  the enjoined party or to the party that's on the receiving end

15  of the broader extension of the stay.

16       While there is harm to tort litigants in having a

17  delay in the consideration of their claims, now sometimes,

18  probably more often then we'd wish but often we've got to deal

19  with that and it's an unfortunate consequence of the need to

20  reorganize debtors.  But here we have no material prejudice to

21  the debtor at all.  So that balancing tips dramatically in

22  favor of not granting the injunction and simply allowing tort

23  litigants to have their day in court.

24       Now why don't we extend that to the means or manner by

25  which this request is unprecedented?  It's unprecedented

38

1  because this is the first case I've seen in my forty years

2  of -- not forty, thirty-nine, years of doing this stuff where

3  we've ever had a nondebtor asking for this relief as contrasted

4  to a debtor.

5       There is some, but not much, prejudice to the movants.

6  They have to defend themselves in a court of law like other

7  defendants have to do all the time.  There's nothing about this

8  that ties their hands in putting forward their defenses to the

9  tort litigants who are suing them but they're prejudiced in the

10  sense that they're losing the freebee of the benefit by

11  availing themselves of the opportunity to have the Court get in

12  the way of the litigation that they'd otherwise have to defend.

13       Now are they prejudiced by having to defend themselves

14  and if it ultimately turns out that they did something for

15  which they're liable having to pay in real one hundred cent

16  green dollars of the United States when they recover their

17  indemnification, if at all, in baby bankruptcy dollars?  Sure.

18  But that's no different than the prejudice that all of the

19  other creditors of this estate have to suffer.  People who have

20  direct claims against the estate, including perhaps the

21  asbestos victims themselves, other tort litigants, bondholders,

22  people who slipped on the ice in front of GM's plant, everybody

23  has to take their recoveries in little baby bankruptcy dollars.

24  And that is not the kind of legally cognizable injury that we

25  weigh in evaluating the balance of harms.

39

1    And lastly, there is the public interest.  I'm going

2  to say, for the second or third or fourth time, that I express

3  no view on whether, when this case or these cases get

4  litigated, the asbestos plaintiffs are going to win or lose.

5  Frankly folks, that's not my business to decide.  I have no

6  ability to decide that nor should I decide that.  But there is

7  a public interest in giving them their day in court unless

8  other factors important to the conduct of the bankruptcy case

9  trump that goal.  Here there is no such countervailing policy.

10    For all of the foregoing reasons the two motions are

11  denied.  Mr. Esserman, I'm going to look to you to carry the

12  ore for the prevailing parties to settle an order in accordance

13  with the foregoing.

14    MR. ESSERMAN:  I will.  Thank you, Your Honor.

15    THE COURT:  All right.  Am I correct that we have no

16  other business today?

17   (No audible response)

18    THE COURT:  Then we're adjourned.

19    MR. HEINEMAN:  Thank you, sir.

20    MR. ESSERMAN:  Thank you, Your Honor.

21   (Proceedings Concluded at 10:46 a.m.)

22

23

24

25

40

1

2                          I N D E X

3

4                           RULINGS

5                                Page      Line

6    All Uncontested Matters,   9        21

7    Of the Day, Approved

8    Motion to Strike Asbestos 16        3

9    Committee's Response,

10   Denied

11   Motions to Extend Stay,    32       24

12   Denied

13

14

15

16

17

18

19

20

21

22

23

24

25

41

1

2                          C E R T I F I C A T I O N

3

4          I, Pnina Eilberg, certify that the foregoing transcript is a

5          true and accurate record of the proceedings.

6

7          _____

8          Pnina Eilberg

9          AAERT Certified Electronic Transcriber (CET**D-488)

10

11         Veritext LLC

12         200 Old Country Road

13         Suite 580

14         Mineola, NY 11501

15

16         Date:  October 7, 2009

17

18

19

20

21

22

23

24

25