

a professional corporation

Eric B. Fisher
**212 374 5359**
fishere@butzel.com

22nd Floor   380 Madison Avenue
New York, New York  10017
**T:** 212 818 1110  **F:** 212 818 0494
**butzel.com**

April 7, 2010

**BY HAND DELIVERY**

The Honorable Robert E. Gerber
United States Bankruptcy Judge
Southern District of New York
One Bowling Green
New York, New York 10004-1408

**Re:**   *Official Committee of Unsecured Creditors of Motors Liquidation Company v.*
*JPMorgan Chase Bank, N.A., et al., Adv. Pro. No. 09-00504*

Dear Judge Gerber:

On behalf of the Official Committee of Unsecured Creditors (the "Committee") of Motors Liquidation Company ("Old GM"), we respectfully submit this supplemental pre-motion letter in response to the March 29, 2010 letter submitted by counsel for JPMorgan Chase Bank, N.A. ("JPMorgan") and in further support of the Committee's request for leave to file a motion for partial summary judgment in the above-referenced adversary proceeding (the "Action"). While the Committee and JPMorgan advance diametrically opposed legal conclusions, both parties continue to agree that the key issue in the case – the legal effectiveness of a particular UCC termination statement filed in October 2008 – is suitable to resolution on summary judgment. Both parties also agree that resolution of this key legal issue before the next phase of discovery will serve the interests of judicial economy and avoid burdening Old GM's estate with the complexity and costs attendant to multi-party litigation.

**I.     The Lien Was Unperfected As Of The Petition Date**

For the reasons already set forth in our March 8, 2010 letter to Your Honor, as a matter of law, the lien (the "Lien") asserted by the lenders under the term loan agreement with Old GM (the "Term Loan") was unperfected as of the day Old GM's chapter 11 case was commenced (the "Petition Date") due to the filing of a UCC termination statement (the "Termination Statement") with respect to the Lien. While the economic consequences of this legal conclusion are potentially enormous, the undisputed facts that lead to this conclusion are straightforward, rendering this issue one that is suitable to resolution on summary judgment.

Ann Arbor   Bloomfield Hills   Boca Raton   Detroit   Lansing   New York   Palm Beach   Washington D.C.
Alliance Offices   Beijing   Shanghai   Mexico City   Monterrey   *Member Lex Mundi*   www.butzel.com

000141216\0006\191090-2

In brief, the material, undisputed facts are as follows: Before the Termination Statement was filed with the Delaware Secretary of State, JPMorgan, as administrative agent for the Term Loan, and its counsel both reviewed the Termination Statement in draft form. They also reviewed several versions of closing checklists, each of which indicated that Old GM's counsel planned to file the Termination Statement. JPMorgan's counsel sent an email approving the documents listed on the closing checklist. Also before the Termination Statement was filed, JPMorgan's counsel executed escrow instructions authorizing the release of the Termination Statement to Old GM's counsel for filing with the Delaware Secretary of State. In October 2008, consistent with the above, Old GM's counsel caused the Termination Statement to be filed. On its face, the Termination Statement states that it was filed with the authorization of JPMorgan. <u>The Termination Statement was one among four different UCC termination statements that were filed by Old GM's counsel pursuant to a closing checklist, exchange of emails, and escrow instructions all reviewed and approved by JPMorgan</u>. JPMorgan does not claim that Old GM lacked authorization to file the other three termination statements, which are not at issue in this case.

We agree with JPMorgan that the question of whether JPMorgan authorized the Termination Statement's filing is the key legal issue.[1] As the above undisputed facts demonstrate, however, the issue of whether the filing of the Termination Statement was authorized is not a close question. It is clear that the Termination Statement was authorized by JPMorgan. In arguing to the contrary, JPMorgan incorrectly conflates the concepts of mistake and authorization.

By way of analogy, this case is no different from one in which a secured lender is presented with several UCC filings, and signs[2] and files all of them. Thereafter, the secured lender claims that it did not *intend* to sign and file one of the UCC filings in the batch. If the secured lender's claim about its state of mind is true, the secured lender's lack of intent to sign and file one of the several UCC filings means that the unintended UCC filing was done by *mistake*. It does not, however, mean that the UCC filing was unauthorized. Because it was authorized by the secured lender, the filing is effective. Under the UCC, authorization is determined by objective indications broadcast through the filing system to the world of creditors. *See generally In re Silvernail Mirror and Glass, Inc.*, 142 B.R. 987, 989 (Bankr. M.D. Fla. 1992) (ruling that termination statement was legally effective even though it "did not reflect the parties' true intent" because the termination statement gave "all indications to the world that [the creditor] was terminating its security interest"); *Rock Hill Nat'l Bank v. York Chem. Indus., Inc., (In re York Chem. Indus., Inc.)*, 30 B.R. 583, 585 (Bankr. D.S.C. 1983) (termination statement was legally effective even though no party intended that the financing statement be terminated).

Authorization does not turn, as JPMorgan argues, on open-ended inquiries into the subjective intent of the secured lender or the borrower. Were the law as JPMorgan wrongly

---

[1] By its silence on the issue of mistake, JPMorgan appears to concede the uncontroversial proposition that mistaken UCC filings are legally effective, provided that they are authorized by the secured lender. *See, e.g., Crestar Bank v. Neal, et al. (In re Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d 1242 (4th Cir. 1992).

[2] For illustrative purposes, this hypothetical assumes a scenario in which there was still a signing requirement for UCC termination statements, as there was before the 2001 amendments to the UCC.

suggests it to be, the "simple and unified structure" of the UCC system would become undependable and would be thrown into disarray. *See generally In re Pac. Trencher & Equip., Inc.*, 27 B.R. 167, 170-71 (B.A.P. 9th Cir. 1983), *aff'd*, 735 F.2d 362 (1984). Every UCC filing would become suspect and its validity would depend on an inquiry into the "true" intentions of the filer. If this case turned on facts about the state of mind of employees and agents of JPMorgan and Old GM, we agree – as the Court indicated at the initial pre-motion teleconference – that summary judgment would not be appropriate and a trial would be called for. We respectfully submit, however, that facts about state of mind are not material to a determination as to whether the Termination Statement was legally effective.[3] Indeed, while the determinative facts will be set forth in greater detail in connection with the Committee's summary judgment motion (if leave is granted to file such a motion), at the risk of being compendious, it is respectfully submitted that all of the facts necessary to resolve this motion are already set forth above in the third paragraph of this letter. Those facts establish that JPMorgan authorized the filing of the Termination Statement, even if it did so by mistake.

The cases relied on by JPMorgan are inapposite. Unlike this case, *In re Feifer Indus., Inc.*, 155 B.R. 256 (Bankr. N.D. Ga. 1993), involved a situation where the financing statement at issue noted two secured parties of record, one of which filed a termination statement listing only itself. The *Feifer* court held that the termination statement only terminated the security interest of the secured party who filed it, leaving the other secured party's security interest intact. Here, in contrast, JPMorgan, the sole party with authority to direct the filing of the Termination Statement, authorized the filing by approving the closing checklists and draft Termination Statement, and by executing the escrow instructions. In *In re A.F. Evans, Co.*, No. 09-41727 EDJ, 2009 WL 282150 (Bankr. N.D. Cal., July 14, 2009), the other case relied on by JPMorgan, the escrow agent for the secured lender filed UCC amendments that were different from those directed by the secured lender. In holding that the escrow agent's act of modifying the UCC amendment was unauthorized, the *A.F. Evans* court emphasized that the secured party did not select, employ or have any contact with such agent, either in writing or verbally. Here, however, Old GM's counsel caused the filing of the Termination Statement following direct communications with JPMorgan and its counsel; moreover, the Termination Statement was filed in exactly the same form in which it was presented to JPMorgan for approval. Accordingly, although it may have been mistaken, JPMorgan authorized the filing of the Termination Statement and the Termination Statement is legally effective.

---

[3] The Committee contests JPMorgan's characterization in its supplemental pre-motion letter of the deposition testimony concerning the "state of mind" of various witnesses with respect to the filing of the Termination Statement and reserves all of its arguments in that regard. Nonetheless, there is no need to belabor the point because "state of mind" is legally irrelevant in this case, where JPMorgan and its counsel approved the draft Termination Statement and JPMorgan's counsel executed escrow instructions authorizing the filing. <u>The filing may have been mistaken, but there is no plausible basis to argue that it was unauthorized</u>. Moreover, testimony about whether individual witnesses thought the filing was "authorized" or not is inadmissible, and thus cannot be advanced in support of JPMorgan's summary judgment motion, for the separate and independent reason that such testimony constitutes inadmissible legal conclusions. *See, e.g., Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) ("recitations of the affiants' mental state" were inadmissible and not considered in opposition to summary judgment motion because "ultimate or conclusory facts and conclusions of law…cannot be utilized on a summary judgment motion").

II.     **Summary Judgment Will Promote The Efficient Resolution Of This Case**

Based on an agreement between the Committee and JPMorgan, which was "so ordered" by this Court, the Committee's time to serve the hundreds of other defendants in this case with the summons and complaint has been tolled until thirty days following resolution of the proposed motion for summary judgment. The Committee entered into this agreement because it believed that this bifurcated approach would promote the efficient and cost-effective conduct of this litigation. If this Court were to rule that the Lien was unperfected as of the Petition Date, then the remainder of this case would relate to the issue of damages – namely, calculating the precise amount of preference and post-petition payments recoverable in this Action. By proceeding in this way, the core liability issue in the case can be resolved without the need to involve hundreds of other parties and lawyers in litigating the issue of the effectiveness of the Termination Statement. Those hundreds of other defendants have no relevant information about the circumstances surrounding the filing of the Termination Statement, and their premature involvement could threaten to turn this case into a logistical nightmare that would be costly for all involved. Accordingly, efficiency considerations weigh heavily in favor of resolving the core liability issue in this Action before proceeding further.

III.    **In The Alternative, Liability And Damages Issues Should Be Bifurcated**

In the event the Court is not persuaded that the issue of the legal effectiveness of the Termination Statement is appropriate for summary judgment, the Committee alternatively requests a bifurcated trial. The decision to bifurcate a trial into liability and damages phases "is firmly within the discretion of the trial court under Fed. R. Civ. P. 42(b)." *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir.), *cert. denied*, 469 U.S. 1072 (1984). "Rule 42(b) of the Federal Rules of Civil Procedure affords a trial court the discretion to order separate trials where such an order will further convenience, avoid prejudice, or promote efficiency." *Amato v. City of Saratoga Springs*, N.Y., 170 F.3d 311, 316 (2d Cir.1999); *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir.1996) ("[t]he interests served by bifurcated trials are convenience, negation of prejudice, and judicial efficiency."). Bifurcation may be appropriate where two phases involving different types of evidence are present, or where litigating the first issue may obviate the need to litigate the second issue. *See generally Katsaros*, 744 F.2d at 278; *Amato*, 170 F.3d at 316. For the reasons already set forth above in section II of this letter, bifurcation would be appropriate here and would promote judicial efficiency.

We thank the Court for its attention to this supplemental pre-motion letter.

                                                Respectfully,

                                                /s/ Eric B. Fisher
                                                Barry N. Seidel
                                                Eric B. Fisher

cc:  John Callagy, Esq.

BUTZEL LONG